In the Matter of WINSLOW PLUMBING, HEATING AND CONTRACTING CO., INC., Bankrupt.

Herbert OLDER, Esq., Trustee of the Estate of Winslow Plumbing, Heating and Contracting Co., Inc., Plaintiff,

v.

Carlton WINSLOW and Mary Winslow, Defendants.

No. H–75–580.

United States District Court, D. Connecticut.

Dec. 30, 1976.

Mark C. Yellin (Yellin, Rittenband & Lubinsky), West Hartford, Conn., for plaintiff trustee.

Arnold J. Bai (Bai, Pollock & Dunningan), Bridgeport, Conn., for defendants Carlton and Mary Winslow.

RULING ON PETITION FOR REVIEW

CLARIE, Chief Judge.

The appellants, Carlton J. Winslow and Mary Winslow, have taken this appeal from a judgment of the bankruptcy court ordering them to turn over. a parcel of land located in Manchester, Vermont, to the

trustee in bankruptcy for Winslow Plumbing, Heating and Contracting Co., Inc. (Winslow PH&C). They argue that the bankruptcy judge erred in not finding that the realty was intended to serve as the ultimate security for a promissory note issued to the Winslows by Nutmeg Plumbing and Heating Company (Nutmeg) in that company's purchase of Winslow PH&C. They also contest the bankruptcy court's finding that there was inadequate consideration for the reconveyance of the property to the Winslows after Nutmeg defaulted on its obligation to them.[1]

While it may have been the Winslows' intention to create the equivalent of a purchase money mortgage in their original transaction with Nutmeg, the court finds that the "collateral security agreement" which they entered into did not effectively encumber the realty as against the claims of creditors. Hence, even if the agreement were to be construed as the appellants claim, the trustee in bankruptcy could still lawfully claim the property in question for the bankruptcy estate.

A further issue here is whether or not there was adequate consideration for the reconveyance of the realty to the Winslows after Nutmeg's default. The court finds that, while the appellants' theory of third party consideration is not entirely without merit, the theory does not apply in this case, since Nutmeg was no longer Winslow PH&C's parent corporation at the time of the contested reconveyance.

## FACTS

On November 25, 1969, Carlton and Mary Winslow, the appellants, entered into a contract with Nutmeg for the sale of Winslow PH&C at a stated price of $91,926.25. At that time, the Winslows owned 100 percent of Winslow PH&C's 251 outstanding shares of stock, as well as the realty on which the company's facilities were located in Manchester, Vermont. The original November 25th agreement anticipated the use of a purchase money mortgage as security for the debt at the closing. See November 25th Agreement, Para. 3 at 2.

However, when the closing took place, on January 8, 1970, the parties signed a "collateral security agreement."[2] Nutmeg paid the Winslows $19,000 in cash and signed a promissory note for the remaining $72,926.25 of the purchase price, payable in monthly installments. In exchange, the Winslows put their 251 shares of Winslow PH&C stock into the possession of their personal attorney to be held by him in escrow pending final satisfaction of the note. Along with the stock, the attorney was to hold the undated resignation letters from all the officers and directors of Winslow PH&C, who had been elected and installed by Nutmeg. Under the terms of the pledge agreement, these letters of resignation could be activated only upon the occurrence of specified contingencies, including a default. Absent such circumstances, Nutmeg's representatives were free to vote the shares and manage the company as its owner.

As the last step in the consummation of the sale and transfer, the Winslows conveyed the title to the real estate used by the business in Vermont to Winslow PH&C.[3] There is no indication in the record that a copy of this security agree-

---

1. The appellants do not directly contest the bankruptcy court's finding with respect to good faith and intent. Their appeal would be inconsequential without such an assertion, however, and thus the court will assume that the appellants do not accept these findings by the bankruptcy court.

2. The difference between a mortgage and the collateral security agreement actually employed is critical. As stated below, the security agreement did not create an effective encumbrance as against creditors of Winslow PH&C,

whereas a purchase money mortgage duly recorded would have done so.

3. The conveyance was to Winslow PH&C, *not* to Nutmeg. Although Nutmeg agreed not to sell or mortgage the Vermont realty in Paragraph 3(a) of the security agreement, this covenant had no binding effect on Winslow PH&C's creditors. It is important to recognize, moreover, that Nutmeg's only claim to the Vermont realty was through the security agreement. It established no independent claim to the land

ment was ever filed on the Manchester Land Records.

For several years Nutmeg operated Winslow PH&C as its subsidiary. In June of 1974, Winslow PH&C's finances had deteriorated to the point that it had become insolvent. It was again found insolvent upon audit in December of 1974, and remained so on all relevant dates thereafter. At the same time Nutmeg's financial condition had also deteriorated and on January 13, 1975 an involuntary petition in bankruptcy was filed against it in Hartford, Connecticut. On January 8, 1975, shortly before the aforesaid petition was filed, Nutmeg failed to tender to the Winslows an installment on its promissory note. Purporting to act under the terms of the security agreement,[4] the Winslows notified Nutmeg's management that a private sale of the stock would be held on February 14, 1975. No representative of Nutmeg was present at the announced sale, and the entire block of Winslow PH&C shares was repurchased for the Winslows' account by their personal attorney.[5]

Having thus regained control of the subsidiary corporation the Winslows elected new officers and directors.[6] As their sole corporate act before resigning, these new officials voted to reconvey the business property in Vermont, which was still held by Winslow PH&C, back to the Winslows individually. The deed was executed on February 14, but not recorded until February 25. On June 16, 1975, within four months of the latter date, an involuntary petition was filed against Winslow PH&C in Vermont.

Upon his appointment, the trustee in bankruptcy for Winslow PH&C filed a complaint, to void the transfer of the aforesaid real estate and to obtain a turn-over order from the court. The bankruptcy court concluded that the conveyance had been fraudulent as to existing creditors of Winslow PH&C, and entered judgment in the trustee's favor, ordering reconveyance within ten days. *Older v. Winslow,* Bankruptcy No. H–75–580 (July 30, 1976, *as corrected,* Aug. 2, 1976). The Winslows have appealed from this judgment.

The court must decide whether or not the bankruptcy judge erred in finding (1) that there was inadequate consideration for the reconveyance of the Vermont realty to the Winslows, and (2) whether the land was intended as the ultimate security in the original transaction between the Winslows and Nutmeg.

## DISCUSSION OF THE LAW

The appellants argue that under the collateral security agreement of January 8, 1970, it was intended that the land on which the business was situated, and which had been conveyed to Winslow PH&C, should

---

apart from its status as Winslow PH&C's prospective owner.

4. The appellees argue that the Winslows did not act in accordance with the agreement, since notice of the proposed private sale was given before the 20-day grace period had expired which was provided for under the security agreement in the event of an overdue payment. Collateral Security Agreement, Jan. 8, 1970, Par. 4, at 3. The sale itself did not take place until the grace period had ended, but the appellees argue that they were entitled to a full 15-day notice period after the default became final. In light of the court's conclusion in this case, it is unnecessary to decide this question. For purposes of this discussion only, the court will treat the notification and sale as valid under the agreement.

5. It should be noted that the nominal consideration ($1.00) paid by the Winslows' representa-

tive to repurchase the shares was not inappropriate under the circumstances. It is undisputed that Winslow PH&C was insolvent at the time of the repurchase, and given the situation any non-negative consideration paid for the stock would have been ample. Far from acquiring a valuable property, the Winslows repurchased a company which was deep in debt. It would be an albatross around their necks if they could not devise a means of withdrawing the company's valuable assets while avoiding its debts. The attempted reconveyance, if accepted by the court, would accomplish this very end.

6. Carlton Winslow was elected president. He and the Winslows' personal attorney (the latter acting as agent for the corporation) undertook the conveyance complained of.

serve as the ultimate security for Nutmeg's promissory note. The appellants in retrospect now concede that a purchase money mortgage would have been a more orthodox means of achieving this end under the circumstances, but they contend that "reconveyance of said realty in the event of default was the intended and only means by which the purpose of the Collateral Security Agreement could be fulfilled."[7]

The court does not doubt that it was the Winslows' intention to regain title to the land in Vermont in the event of a default by Nutmeg. Indeed, under normal circumstances this would be the logical result of a failure by Nutmeg to meet its payments, since the Winslows could reacquire their shares in the company with relative ease at a private sale.[8] What the collateral security agreement failed to insure against was the very contingency which occurred—that is, the insolvency of Winslow PH&C. Unlike a purchase money mortgage, duly recorded on the land records, the collateral security agreement in this case was at best a "secret encumbrance." It did not create a valid lien against the realty, effective as against the creditors of the corporation. While it is true that Nutmeg agreed not to encumber the Vermont realty,[9] this promise has no bearing on the rights of the trustee in bankruptcy.

In the absence of a recorded lien, it makes no difference whether the court accepts or rejects the interpretation of the collateral security agreement proposed by the appellants, since this interpretation would not affect the rights of Winslow PH&C's trustee in bankruptcy.[10]

A further question on this appeal is whether the bankruptcy judge erred in finding that the reconveyance of the Vermont land from Winslow PH&C to the Winslows individually was fraudulent under § 67d of the Bankruptcy Act, because it was undertaken without lawful consideration. The appellants contend that satisfaction of the debt owed to the Winslows by Nutmeg was acceptable consideration, since Nutmeg was Winslow PH&C's parent corporation, and any benefit conferred on one redounded to the benefit of the other on an "identity of interest" theory. *See Williams v. Twin City Co.,* 251 F.2d 678 (9th Cir. 1958); *Barr & Creelman Mill and Plumbing Supply Co. v. Zoller,* 109 F.2d 924 (2d Cir. 1940); *McNellis v. Raymond,* 287 F.Supp. 232 (N.D. N.Y.1968), *rev'd on other grounds,* 420 F.2d 51 (2d Cir. 1970); *Hofler v. Marion Lumber Co.,* 233 F.Supp. 540 (E.D.S.C.1964).

The bankruptcy judge cited Collier's treatise to the effect that "[t]ransfers made to benefit third parties are clearly not made for a 'fair' consideration . . . . No more should a conveyance by a corporation for the benefit of an affiliate be regarded as given for fair consideration as to the creditors of the conveying corporation." 4 Collier on Bankruptcy ¶ 67.33 at 514.1— 514.2; *id.* notes 33 & 36; *see also* 30 A.L. R.2d 1209 (1953). This rule is certainly sound when applied in cases such as those involving the gratuitous payment of one spouse's debts by the other, or of a parent corporation's debts by its subsidiary.[11]

---

7. Appellants' Brief, October 13, 1976, at 4. The appellants attempt to reinforce this point with an analysis of the various numerical values involved in the transaction. The court is at pains to comprehend the point of the proposed analysis.

8. At a private sale following a default, the Winslows *could probably outbid Nutmeg, since* Nutmeg's liquidity would presumably be strained, and since the Winslows would in effect be paying themselves, at least as long as the price paid at the sale did not exceed the *total net value of Winslow PH&C's assets.*

9. *See* note 3 *supra.*

10. A conclusion favorable to the appellants on this point might well affect the question of whether or not the transactions in question were carried out in good faith. The court expresses no view here on the question of good faith; since the opinion of the bankruptcy judge will be upheld on the question of fair consideration, this issue need not be reached.

11. Not all of the cases cited by Collier may be dismissed so easily. *See, e. g., Bennett v. Rodman & English, Inc.,* 2 F.Supp. 355 (E.D.N.Y.), *aff'd per curiam,* 62 F.2d 1064 (2d Cir. 1932). The rule in *Bennett* seems to have been cast in doubt by later decisions, however. *See Barr & Creelman Mill and Plumbing Supply Co. v. Zoller,* 109 F.2d 924 (2d Cir. 1940); *McNellis v.*

Where the facts are otherwise, however, each case must be assessed on its own merits. *McNellis v. Raymond*, 287 F.Supp. 232, 238 (N.D.N.Y.1968), *rev'd on other grounds*, 420 F.2d 51 (2d Cir. 1970). In particular, where a transfer is made by one party which reduces the debt of a second party with whom the first shares an "identity of interest," the court may find that there has been fair consideration.

In the present case, Winslow PH&C did transfer an asset (the Vermont realty) without receiving direct consideration in return.[12] The true beneficiary was Nutmeg, whose debt to the Winslows was thereby reduced. It must be remembered, however, that Winslow PH&C itself received the realty for no consideration in the original transaction between Nutmeg and the Winslows, and it was in this same transaction that Nutmeg's debt to the Winslows arose. Should the court find that an "identity of interest" existed between Winslow PH&C and Nutmeg at the time of the contested transfer, then an argument of fair consideration might be colorably maintained.

■ The appellants' position must fail, however, not because there was insufficient consideration per se but rather because at the time of the contested transfer there was no "identity of interest" between Nutmeg and Winslow PH&C. When the contested reconveyance occurred, the Winslows had already exercised the private sales clause of the collateral security agreement and repurchased the Winslow PH&C shares through their attorney. At the moment of reconveyance, therefore, Nutmeg and Winslow PH&C became separate entities in every sense. Any bond that once existed between them had already been severed.

Raymond, 287 F.Supp. 232 (N.D.N.Y.1968), *rev'd on other grounds*, 420 F.2d 51 (2d Cir. 1970).

12. The appellants argue that postponement of bankruptcy is in itself adequate consideration. While this argument might have an effect in some circumstances, it is misplaced here, and even if it were accepted the proposed consideration would certainly not be sufficient to offset the loss of Winslow PH&C's sole substantial asset.

Of particular importance is the status of Nutmeg's relationship to the Vermont realty after the default and private sale. Had the transaction proceeded as originally planned, effective ownership and control of the land would have passed to Nutmeg automatically when it took final control of the Winslow PH&C stock. Once default occurred, however, Nutmeg lost all rights to the property, since no steps were taken to encumber the land on Nutmeg's behalf outside the terms of the collateral security agreement.[13] Once the private sale took place Winslow PH&C owed nothing to Nutmeg in any way concerning the Vermont property. This being so, Winslow PH&C had nothing whatever to gain from the elimination of Nutmeg's debt to the Winslows personally. It follows that no consideration, direct or indirect, could have been received by Winslow PH&C in return for its conveyance. Judge Seidman's final conclusion was valid, in his original opinion, when he stated:

> "Far from being a benefit to the bankrupt, the transfer of the real estate removed the only substantial asset [Winslow PH&C] had. The transfer was without any consideration whatsoever." *Older v. Winslow, supra*, at 10.

■ When the Winslows removed the sole major asset of Winslow PH&C, a corporation which was already insolvent, they defeated any chance the company's creditors might have had to recover a portion of the debts which they were owed. The transfer violated § 67d of the Bankruptcy Act, a dominant principle of which is the treatment of creditors on an equal footing. The decision of the bankruptcy court is therefore affirmed. SO ORDERED.

13. The case might be different if Winslow PH&C had not been insolvent when Nutmeg defaulted. In that situation, the value of the Winslow PH&C shares might have exceeded the debt owed by Nutmeg to the Winslows, which at the time of default had been paid down to approximately $40,000. In that case, Nutmeg's interest in the land might not have been entirely destroyed.